UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| Robert L. Smith, Jr., | : | Case: 3-16-cv-168 |
| *also known as* Bigg Robb, | : | |
| *doing business as* Jenner Music Group, | : | Judge Thomas M. Rose |
| *doing business as* Over 25 Sounds, | : | |
| *doing business as* Bigg Robb Music, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Bernard Thomas, | : | |
| *also known as* Bishop Bullwinkle, | : | |
| *also known as* Bishop Bullwinka, | : | |
| *doing business as* Beswes, | : | |
| *doing business as* Best West Publishing | : | |
| et al., | : | |
| | : | |
| Defendant. | : | |

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENT
ON COMPLAINT FOR COPYRIGHT INFRINGEMENT; ENTRY AND ORDER
DENYING MOTION TO STRIKE (DOC. 25) AND TERMINATING THIS CASE**

---

This copyright infringement action was scheduled for jury trial on February 5, 2018 at 9:00 AM. Plaintiff Robert L. Smith ("Smith"), proceeding *pro se*, appeared at the scheduled time, but Defendant Bernard Thomas ("Thomas"), also proceeding *pro se*, failed to appear. The Court held a Final Pretrial Conference with Smith, during which he signed and submitted a Waiver of Jury Trial (Doc. 27). The Court then dismissed the jury pool and held a bench trial on Smith's copyright infringement claim. Smith

1

completed his presentation of argument and evidence on the same day. Thomas never appeared.

About two months before trial, Smith filed a Motion to Strike under Fed. R. Civ. P. 12(f)(2), by which he sought to strike Thomas's assertion—presumably in his response to Smith's Motion for Summary Judgement because it does not appear in his Answer to the Complaint—that Smith's song, "Looking for a Country Girl," was not an original work. A motion to strike under Rule 12(f) applies only to pleadings and must be brought in response to the offensive pleading or within 21 days of service of that pleading. Smith's Motion to Strike fails on both counts. In addition to those defects, the Motion to Strike is moot since the Court has completed a bench trial, during which Thomas failed to appear. The Motion to Strike (Doc. 25) is therefore **DENIED**.

Pursuant to Federal Rule of Civil Procedure 52(a), based upon the record in this case and the evidence submitted at trial, the Court makes the following findings of fact and conclusions of law and enters final judgement as follows.

I. <u>**FINDINGS OF FACT**</u>

1. Smith is a recording artist, recording label owner, and music publisher who resides in Dayton, Ohio.
2. Smith is also known professionally as Bigg Robb.
3. In 2012, Smith wrote and recorded a song entitled "Looking For a Country Girl". It was released on CD, as part of an album called "Juke Joint Music," in the same year.

4. Smith registered his copyright in "Looking for a Country Girl" with the United States Copyright Office.

5. Thomas is a musician and performing artist, also known as Bishop Bullwinkle.

6. While Smith was doing a show in Tampa, Florida, in 2015, he heard "Looking for a Country Girl" playing over the public address system before his performance. Smith went to the stage to see why his music was playing. He saw Thomas singing different lyrics over the first 12 seconds of "Looking for a Country Girl." In the music industry, this practice is called "sampling" another artist's work.

7. Smith engaged Thomas in a conversation, during which Thomas admitted to singing new lyrics over "Looking for a Country Girl" for one of his own songs. Thomas also admitted to producing a CD that included the song sampling "Looking for a Country Girl." Thomas was selling copies of the CD in the park that day.

8. Thomas had not requested permission to use "Looking for a Country Girl" for any purpose. Smith had never met Thomas before and never worked with him until the show in Tampa, Florida.

9. The title of Thomas's song is "Hell 2 the Naw Naw." The sample from "Looking for a Country Girl" that Thomas used in making "Hell 2 the Naw Naw" does not contain any lyrics.

10. Thomas made a music video for "Hell 2 the Naw Naw."

11. "Hell 2 the Naw Naw" became very popular online and deejays started playing it on the radio stations.

12. Smith informed Thomas that he expected to be compensated for Thomas's use of "Looking for a Country Girl." Smith and Thomas exchanged telephone numbers to discuss this issue.

13. Thomas initially did not believe that Smith owned the rights to the sampled portion of "Looking for a Country Girl." After some research, however, Thomas acknowledged Smith's ownership.

14. Thomas told Smith that he did not have any money and did not know how he was going to compensate Smith.

15. Smith asked Thomas to stop producing CDs and promoting "Hell 2 the Naw Naw" until they could reach an agreement regarding compensation. Thomas, however, did not stop promoting or performing "Hell 2 the Naw Naw."

16. On March 15, 2014, Thomas began selling a CD entitled "Bishop Bullwinkle," which contained the song "Hell 2 the Naw Naw."

17. Thomas sold the CD that included "Hell 2 the Naw Naw" for $4.99 on his website bishopbullwinkle.com.

18. Thomas occasionally called Smith to inform him what he wanted to do with "Hell 2 the Naw Naw." During those discussions, Smith made it clear that he wanted to be compensated before he would allow Thomas to use the sample from "Looking for a Country Girl."

19. Smith found Thomas's music video of "Hell 2 the Naw Naw" on YouTube after he had asked Thomas to stop using his music and producing the song.

20. Thomas's music video, published under the name Bishop Bullwinkle, has over 12 million views on YouTube. From the YouTube video, Thomas received recognition from Jimmy Kimmel, the ABC television host. Kimmel referred to "Hell 2 the Naw Naw" during a show and his band played a portion of it.

21. Smith received a letter from NBC with the intent of starting a show using the song "Hell 2 the Naw Naw." NBC representatives sent the letter to Smith to confirm that the copyright issue was resolved, at which time Smith informed them that he had not been compensated.

22. During negotiations between Smith and Thomas regarding compensation, Smith demanded 75% of the publishing rights for "Hell 2 the Naw Naw." Smith reasoned that he deserved a larger share of the publishing rights because Thomas had not paid him anything from the revenue generated by the song up to that point. Thomas counter-offered 50%.

23. Smith sent a proposed agreement, which gave Smith 75% of the publishing rights, to Thomas, but Thomas never signed it.

24. After further negotiation, Smith revised the proposed agreement to give himself 50% of the rights to "Hell 2 the Naw Naw." Again, this agreement was never signed by the parties.

25. Thomas has earned income from public performances of "Hell 2 the Naw Naw." Smith estimated that Thomas could make anywhere from $5,000 to $7,500 a night performing "Hell 2 the Naw Naw," but Smith did not have evidence showing how many such performances have actually occurred or what payments, if any, were made to Thomas for them.

## II. APPLICABLE LAW

26. Subject to certain enumerated exceptions, the Copyright Act gives copyright owners the exclusive rights to reproduce, prepare derivative works from, distribute, and publicly perform or display a copyrighted work. 17 U.S.C. § 106.

27. "Under the copyright act, sound recordings are works that result from the fixation of a series of musical, spoken, or other sounds. . . . Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights." *Bridgeport Music, Inc. v. Still N the Water Publ'g*, 327 F.3d 472, 475 n. 3 (6th Cir.2003).

28. The Copyright Act provides that "[a]nyone who violates any of the exclusive rights of the copyright owner" is guilty of infringement, 17 U.S.C. § 501(a), and further "allows the legal or beneficial owner of an exclusive right under a copyright ... to institute an action for any infringement of that particular right." *Fogerty v. MGM Grp. Holdings Corp.*, 379 F.3d 348, 352 (6th Cir.2004) (internal quotations and citations omitted).

29. "There are two essential questions at the heart of any copyright infringement action: whether the plaintiff owned the copyrighted work and whether the defendant copied it." *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 274 (6th Cir.2009); *see also Stromback v. New Line Cinema*, 384 F.3d 283, 293 (6th Cir.2004) (Copyright infringement has two elements: "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original.").

### III. SMITH'S CLAIM FOR COPYRIGHT INFRINGEMENT

30. Smith brings one claim against Thomas for infringement of his copyright in "Looking for a Country Girl." Smith alleges that Thomas sampled a portion of the music from "Looking for a Country Girl" in his song "Hell 2 the Naw Naw." Smith alleges that the unauthorized sampling is an infringement of his copyright and that Thomas committed additional violations of Smith's ownership rights by publishing a CD containing "Hell 2 the Naw Naw," publishing a music video for "Hell 2 the Naw Naw," publicly performing "Hell 2 the Naw Naw," and licensing "Hell 2 the Naw Naw."

31. The Court finds that Smith has established by a preponderance of the evidence that (1) he owned a valid copyright in "Looking for a Country Girl" and (2) Thomas infringed the copyright in that work by sampling it in "Hell 2 the Naw Naw."

32. The Court further finds that Thomas further infringed "Looking for a Country Girl" by publishing a music video and publicly performing "Hell 2 the Naw Naw" without Smith's authorization.

## IV. SMITH'S REMEDIES

33. The Copyright Act authorizes the issuance of injunctive relief "on such terms as it may deem reasonable to prevent or restrain infringement on a copyright." 17 U.S.C. § 502.

34. Under the Copyright Act, a copyright owner may obtain actual damages resulting from the infringement along with the infringer's profits. 17 U.S.C. § 504(b).

35. Where a copyright has been registered before or roughly contemporaneously with an infringement, a plaintiff may elect to obtain statutory damages in lieu of actual damages. 17 U.S.C. § 504(c).

36. Here, Smith did not present sufficient evidence for the Court to award actual damages.

37. At the plaintiff's election, a court may award statutory damages, instead of actual damages, "for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually . . . in a sum not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1).

38. In addition, if the Court finds that the infringement was willful, it has discretion to increase the award of statutory damages to a sum of not more than $150,000. 17 U.S.C. § 504(c)(2).

39. At trial, Smith asked for the $150,000 in statutory damages available under § 504(c)(2), which is sufficient to elect this remedy in light of his *pro se* status.

40. The Court finds that Smith is entitled to statutory damages for Thomas's willful infringement on the copyright in "Looking for a Country Girl."

41. Based on the facts presented at trial, the Court finds statutory damages in the amount of $10,000 are appropriate, which are trebled for willful infringement to a total award of $30,000.

42. Smith further requested that the Court enter a declaration that he is the 75% owner of the copyright in "Hell 2 the Naw Naw."

43. Smith testified that the reason for the 75/25 split, rather than 50/50, was to account for the proceeds that have not been paid to him to date. The Court finds, however, that its award of statutory damages adequately addresses Thomas's past conduct.

44. Under the Declaratory Judgment Act, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Accordingly and based on the evidence presented at trial, the Court hereby **DECLARES** that Smith owns:

a. 50% of the publishing rights in the composition "Hell 2 the Naw Naw" and any other derivatives of this composition controlled by Thomas whether known now or in the future;

b. 50% of ownership in the copyright and master recording of "Hell 2 the Naw Naw;"

c. 50% of the writers' share of "Hell 2 the Naw Naw," including the original version and any derivatives;

d. 50% of the proceeds received from any video recording of "Hell 2 the Naw Naw;" and

e. 50% of the proceeds received from the synchronization rights for "Hell 2 the Naw Naw."

45. Smith is also entitled to an injunction in light of Thomas's demonstrated intent to continue infringing "Looking for a Country Girl." Therefore, the Court hereby **ENJOINS** Thomas, and his respective agents, servants, employees, officers, successors, licensees, and assigns, and all persons acting in concert or participation with each or any of them, from continuing to infringe Smith's copyright in "Looking for a Country Girl."

## IV. CONCLUSION

As the Court has **DENIED** Smith's Motion to Strike (Doc. 25) and entered its Findings of Fact, Conclusions of Law and Final Judgment on Smith's Complaint, this action is hereby **TERMINATED** on the docket of this Court.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, March 27, 2018.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE